# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

JAMES YATES,                   )

                                    )

     **Plaintiff,**             )

                                      )

**v.**                              )     **No. 3:09-CV-51**

                                    )     **(Phillips)**

**BECHTEL JACOBS CO., LLC,** *et al.*,   )

                                      )

     **Defendants.**          )

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross-motions for Judgment on the Administrative Record [Docs. 12, 18]. Plaintiff, a former employee at Bechtel Jacobs Company, LLC ("BJC") seeks Accidental Permanent Total Disability benefits for a work-related injury that occurred on June 9, 2005. On January 8, 2007, the administrator of BJC's retirement plans–Life Insurance Company of North America ("LICNA")–denied Plaintiff's request for benefits. Plaintiff appealed the denial, and LICNA affirmed its denial on February 13, 2007.

Having exhausted his administrative remedies, Plaintiff filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. [Plaintiff's Complaint, Doc. 1]. Plaintiff alleges that BJC, LICNA, and Bechtel Jacobs Company Special Accident Insurance Plan (collectively, the "Defendants") denied him benefits in violation of 29 U.S.C. § 1132(a)(1)(B). [Id.]. Specifically, Plaintiff argues that LICNA's denial was procedurally defective, and substantively wrong. [Id.]. In response, LICNA argues that: (1) Plaintiff received a "full and fair review"; and (2) its decision was supported by substantial evidence in the

Administrative Record.  [*See* Defendants' Memorandum of Law in Support of their Motion for Judgment on the Administrative Record, Doc. 13].

Unlike most ERISA cases, the Court is required to review the plan administrator's decision under the *de novo* standard, rather than the deferential "arbitrary and capricious" standard. Accordingly, the Court must determine whether LICNA provided a "full and fair review," and whether the decision was substantively "correct."

For the following reasons, Defendants' Motion for Judgment on the Administrative Record [Doc. 12] is **DENIED** and Plaintiff's Motion for Summary Judgment [Doc. 18] is **GRANTED IN PART AND DENIED IN PART**.  While the Court holds that LICNA did not provide a "full and fair review," the Court does not find that Plaintiff was "clearly entitled" to long-term disability benefits.  Accordingly, the appropriate remedy is to **REMAND** this case to the plan administrator for a "full and fair review" that is consistent with this Memorandum and Order.  On remand, the plan administrator is **ORDERED** to conduct a vocational evaluation that is consistent with this ruling.

## I.     BACKGROUND

As an initial matter, the Court notes that is has subject matter jurisdiction pursuant to 29 U.S.C. §§ 1132 and 1332.  Moreover, the case is ripe for adjudication because Plaintiff has exhausted his administrative remedies under the relevant medical benefits plan.

Plaintiff, a former employee at BJC, was a participant in an ERISA-governed health benefits plan.  [Plaintiff's Complaint, Doc. 1, at 3].  Under the plan, LICNA[1] agreed to provide insurance

---

[1]  The Court will refer to "LICNA" and "CIGNA Group Insurance" interchangeably.  LICNA is an insurance subsidiary of CIGNA Group Insurance that serves as its underwriter.  [AR 218].  In Serrato v. Short Term Disability Income Plan for the Class 46 Emps. of Lear Corp., the plaintiff filed an ERISA claim against an employee benefit plan that was administered by CIGNA.  No. 1:08-CV-780, 2009 WL 732159 (W.D. Mich. Mar. 12, 2009).  In that case, the court referred to "CIGNA" and "LICNA" interchangeably.  Id., at *1 n.3.  As the court explained, "[n]either the Plan Document nor the Summary

coverage to BJC employees.  [Id.].  Plaintiff was a participant in Policy # OK 821732 (the "Policy"),

which provided disability benefits for covered employees.  [AR 246].  In this case, Plaintiff seeks

Accident Permanent Total Disability Benefits (the "Benefits"), a form of long-term disability

benefits.

To be eligible for the Benefits, Plaintiff must be considered "permanently totally disabled."

To qualify, Plaintiff must satisfy the following criteria:

> **Coverage B: Permanent Total Disability (Not Applicable to Dependents):**
>
> We will pay this benefit if the Insured:
>
> > 1.  is injured by an accident covered by the policy; and
> >
> > 2.  is totally disabled within 365 days after the accident; and
> >
> > 3.  is totally disabled for 12 straight months; and
> >
> > 4.  is then permanently totally disabled.
>
> An Insured will be deemed 'totally disabled' if he can not do the substantial and material duties of his type of work at all.  He will be deemed 'permanently totally disabled' if he can not do any work for which he is or can become qualified by reason of his education, experience or training; and if he is not expected to be able to do any such work for the rest of his life.

---

Plan Description refers to CIGNA.  The Administrative Services Agreement, appended to the Plan Documents, refers to Life Insurance Company of North America ('LICNA').  While many of the documents in the Administrative Record contain the CIGNA name and logo on the top of the letterhead, the correspondences indicate that LICNA administers the Plan and 'CIGNA' and 'CIGNA Group Insurance' are service marks of CIGNA Corporation that refer to its various operating entities, including LICNA.  Accordingly, the Court will refer to CIGNA and LICNA interchangeably."  Like Serrato, there are numerous documents in the Administrative Record that contain CIGNA's name and logo on the letterhead.  [*See, e.g.*, AR 135].  However, also like Serrato, the employee benefits plan only refers to LICNA.  [AR 246].  Because LICNA is an insurance subsidiary of CIGNA, the Court will refer to "LICNA" and "CIGNA" interchangeably.

[AR 268].

Plaintiff's work history is limited mostly to construction labor. [Disability Questionnaire, AR 236-39]. As a BJC employee, Plaintiff worked as a laborer, mechanical operator, and chemical operator. [AR 61]. From January 2000 until March 2004, Plaintiff worked as a "laborer," during which he "moved furniture . . . loaded trains . . . mowed grass . . . [and] mov[ed] tools place to place." [AR 239]. From March 2004 until July 2005, Plaintiff worked as a "chemical operator," during which he "loaded boxes by hands . . . separated mixed radioactive waste . . . [and used] fork trucks, cranes . . ." [Id.]. While Plaintiff is a high school graduate, he does not have any further education or training. [AR 238].

On June 9, 2005, Plaintiff injured his left leg and back while lifting a generator into a van. [AR 139]. The injury was diagnosed as a "L5-S1 herniated disc with compression of the S1 nerve root." [AR 3]. Following the injury, Plaintiff met with medical providers for treatment. [AR 13]. This included Dr. Elmer Pinzon ("Dr. Pinzon"), one of Plaintiff's treating physicians. [AR 174]. During their first meeting on September 7, 2005, Dr. Pinzon conducted an X-Ray and performed visual examinations of Plaintiff's spine, hip, and lumbar spine. [AR 175-76]. During these examinations, Dr. Pinzon found evidence of "multilevel lumbar degenerative disc disease," and "left lateral disc herniation." [AR 176]. Consequently, Dr. Pinzon recommended that Plaintiff only participate in "light duty" activities. [Id.]. This meant that Plaintiff was not supposed to lift objects heavier than twenty-five pounds, was supposed to alternate between sitting and standing duties, and was to engage in only limited bending, stooping, and squatting. [Id.]. Dr. Pinzon also recommended continued medication for pain relief, spinal injections, and physical therapy. [AR 176-77].

On September 22, 2005, Plaintiff began physical therapy sessions with the Tennessee

Orthopedic Clinic. [AR 213-15]. On the first day of therapy, Plaintiff stated that his pain was at a level of "7/10". [Id.]. Plaintiff continued physical therapy sessions at the Tennessee Orthopedic Clinic until October 26, 2005. [Id.]. Dr. Pinzon states that the sessions did not result in significant improvement:

> [Plaintiff] has been through conservative management including fairly extensive physical therapy here at Spine Knoxville with Shawn Smith. He is not showing any significant improvements with that. I had also sent him for a transforaminal epidural steroid injection on 10/24/05 to the left L5-S1 segment and subsequently on 10/31/05 to the left SI segment. He felt that the second transforaminal approach actually helped more with the leg pain. Did not seem to have complete relief. I reviewed his EMG test with him as well. In fact, it does confirm that he does have a chronic subacute left S1 predominantly lumbar radiculopathy. . . . I feel that conservative management has not been beneficial to him at this point and given his persistent leg pain with a pain of 7/10 with no improvements, I will proceed on with a more invasive percutaneous disc decompression option primarily to the left L5-S1 and L4-5 segment to see if we can minimally decompress his disc segment and that way take some pressure off the discogenic source for the nerve as noted on EMG and MRI findings.

[AR 184]. From October 27, 2005, until February 3, 2006, Plaintiff continued physical therapy sessions with Dr. Pinzon. [AR 190, 184-86, 181-83, 187-89]. Plaintiff remained on "light duty" status during this time. [Id.].

Plaintiff worked for BJC until January 16, 2006. [Plaintiff's Complaint, Doc. 1, at 3, ¶ 14]. On February 15, 2006, Plaintiff filed a claim seeking $60,000.00 in Accidental Permanent Total Disability Benefits. [AR 220]. On April 25, 2006, LICNA acknowledged receipt of Plaintiff's claim. [AR 218]. Even after the claim was filed, Plaintiff continued to meet with physicians for consultations and physical therapy.

On February 3, 2006, Plaintiff was referred to neurosurgeon, Dr. David Hauge ("Dr.

Hauge"). [AR 132-34]. On April 10, 2006, Dr. Hauge recommended that Plaintiff undergo a lumbar diskectomy. [AR 128-29]. On June 12, 2006, Dr. Hauge performed the surgery. [AR 117-18]. Following the surgery, Dr. Hauge referred Plaintiff to the Patrician Neal Outpatient Center for physical therapy sessions. [AR 49]. During one of the sessions, the physical therapist noted that Plaintiff demonstrated "self-limiting behavior." [AR 44]. For example, the physical therapist noted that Plaintiff "walks [without] a limp on treadmill, but resumes limp when off of it." [Id.]. Defendants argue that this behavior "suggested [Plaintiff] tried to hide, or self-limit, his actual ability" to perform physical activities. [Defendants' Memorandum of Law in Support of their Motion for Judgment on the Administrative Record, Doc. 13, at 4]. Based upon Plaintiff's continued back pain following the surgery, Dr. Hauge performed a second lumbar spine diskectomy on October 13, 2006. [AR 77-78, 81-85].

On December 4, 2006, a clinical specialist performed a Physical Work Performance Evaluation ("PWPE"). [AR 58-66]. Linda Preston ("Ms. Preston") conducted the PWPE, which consisted of thirty-six tasks divided into seven sections. [AR 58]. The test assessed Plaintiff's dynamic strength, position tolerance, mobility, fine motor skills, balance, and endurance. [Id.]. Ms. Preston summarized Plaintiff's "overall level of work" as follows:

**Overall Level of Work:**

Based on the information summarized in the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, the client is capable of performing physical work at the light level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. Based on this evaluation, the client is capable of sustaining the light level of work for an 8-hour day.

[Id.]. Ms. Preston's summary was based in part on the "self-limiting"

behavior by Plaintiff. [Id.]. As Ms. Preston explains, "self-limiting participation" means "that the client stopped the task before specific physical signs of a safe maximal effort were observed." [Id.]. Ms. Preston summarized Plaintiff's "self-limiting" behavior as follows:

**Overall Level of Client Participation:**

> Throughout this evaluation, participation was determined by comparing the client's willingness to exert a maximal effort to the evaluator's observations of client effort. Based on the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, the client participated fully in 11 out of 19 tasks and demonstrated self-limiting participation by stopping on 8 out of 19 tasks.

[Id.]. LICNA argues that Plaintiff's "self-limiting" behavior was motivated by financial gain, rather than physical limitations. [Defendants' Memorandum of Law in Support of their Motion for Judgement on the Administrative Record, Doc. 13, at 10]. However, Ms. Preston claims that "self-limiting" behavior can be based upon several factors:

> Self-limiting participation may be due to one, or any combination, of several factors. Some common factors contributing to self-limiting participation are: pain, fear of pain, fear of injury/re-injury, depression, anxiety, lack of familiarity with a safe physical maximum, and a lack of motivation to perform maximally secondary to perceived financial gain. The client's reported reason(s) for self-limiting participation were left buttocks pain, stinging sensation in lumbar spine, and/or radicular symptoms.

[Id.]. While the PWPE "cannot be used to assess the complex factors underlying self-limiting participation" [AR 58], the test does suggest a correlation. In particular, the PWPE states that if a client "self-limited on 5 to 67 tasks, psychosocial and/or motivational factors may be influencing physical performance." [Id.]. In this case, Plaintiff self-limited on eight tasks. [Id.]. As the PWPE explains, "[i]f your client self-limited on 8 or more of the tasks, it is even more likely that

psychosocial and/or motivational factors may be influencing physical performance." [Id.]. Based

upon the PWPE, Ms. Preston concluded that Plaintiff was capable of sustaining "light level" work

for an 8-hour day, within the meaning of the Department of Labor's "Dictionary of Occupational

Titles" ("DOT"). [Id.].[2]

On January 5, 2007, a vocational rehabilitation specialist, Vince Engel ("Mr. Engel"),

conducted a Transferrable Skills Analysis ("TSA"). [AR 28]. As LICNA explains, the TSA is "a

method of determining whether you can apply previously learned work skills and education to

different but related occupations within your restrictions and limitations." [AR 23]. Mr. Engel

claims that the TSA was based upon Plaintiff's education, work history, and the results from the

PWPE conducted by Ms. Preston. [AR 28.]. Mr. Engel concluded that based upon this information,

Plaintiff could work in an occupation having a "sedentary to light level of physical demand." [Id.].

In support, Mr. Engel noted that Plaintiff "has adequate use of his upper extremities for reaching at

_____

[2] Although it is not expressly part of the Administrative Record, the Court takes judicial notice of the DOT.  *See* Evans v. Metro. Life Ins. Co., 190 F. App'x 429, 436 n. 7 (6th Cir. 2006) (recognizing that courts may take judicial notice of the DOT); Osborne v. Hartford Life & Accident Ins. Co., 465 F.3d 296, 299 (6th Cir. 2006) (finding that occupational duties can properly be determined using objective sources such as the DOT).  As the Court of Appeals stated in Osborne, "[w]e agree with the district court that Hartford's use of the Dictionary [the DOT] to determine Osborne's 'own occupation' was not arbitrary and capricious, but on the contrary was 'reasonable.'" 465 F.3d at 299.

For more background on the DOT, *see* Smith v. Champion Int'l Corp., 573 F. Supp. 2d 599 (D. Conn. 2008).  As the court in Smith explained, "[a]lthough it was last updated in 1991, it [the DOT] is commonly used to determine alternative occupations in Social Security and private disability cases." Id. at 619 (citation omitted).  "The DOT includes a variety of information about each listed occupation, reflected in numerical codes in the occupation title and 'trailer.'  This information includes the industry, worker functions involved in the occupation, the date the definition was last updated, the level of specific vocational preparation required, and the reasoning, language, and math skills required.  'Worker functions' are divided into functions related to 'data,' 'people,' and 'things.'  For example, a highly responsible position might require 'mentoring' others, while a less responsible position would require 'taking instructions-helping' others." Id. (citations omitted).

desk level, fine manipulation and simple and firm grasping." [Id.].

In his TSA, Mr. Engel determined that Plaintiff was capable of performing six jobs. [Id.]. These jobs included: (1) repair-order clerk; (2) check cashier; (3) service clerk; (4) order clerk; (5) registration clerk; and (6) surveillance system monitor. [Id.]. While Mr. Engel stated that he considered Plaintiff's work history, he did not discuss any of Plaintiff's past jobs. [Id.]. Nor did Mr. Engel describe the skills required to perform the six jobs that he identified. [Id.]. It appears that Mr. Engel based most of his decision on Plaintiff's physical limitations, as assessed in the PWPE.

Instead of listing the actual skills required for the six jobs, or how Plaintiff's work history and education prepared him for those jobs, Mr. Engel simply listed the DOT's "Specific Vocational Preparation"("SVP") number for each of the jobs. [Id.]. The jobs of repair-order clerk, check cashier, and registration clerk, were identified as having an SVP of "3". [Id.]. The service clerk and order clerk jobs were identified as having an SVP of "4". [Id.]. The surveillance-system monitor was identifed as having an SVP of "2". [Id.]. Each of these jobs was identified as being "sedentary." [Id.]. Plaintiff's previous jobs, which included material handler, laborer, and chemical operator II, were identified as having SVP's of "3," "2," and "4". [Id.]. As noted in the DOT, jobs with an SVP ranging from "1.0-3.4" require the "lowest level of educational and training preparation and includes occupations that require up to 3 months of training. It includes a large number of less complex service occupations, as well as materials handlers and machine/equipment tenders or operators." STRATIFYING OCCUPATIONAL UNITS BY SPECIFIC VOCATIONAL PREPARATION (SVP), http://www.oewd.org/media/docs/workforcedevelopment/procedures%20and%20forms/adult/SVP.pdf (last visited Mar. 14, 2011). Jobs with an SVP ranging from "3.5 to 5.4" includes "occupations that are judged to require more than 3 months, but not more than one year, of

occupation-specific training. It includes a large number of service positions, as well as clerical, maintenance, and operator positions." [Id.].

On January 8, 2007, LICNA denied Plaintiff's claim for Benefits. [AR 24]. Specifically, LICNA found that Plaintiff was not "unable to do any work for which [he] is or may become qualified by reason of [his] education, experience or training." [AR 24]. In the denial letter, LICNA stated that it relied on the following documents: (1) the Group Association/Proof of Loss form; (2) BJC's Medical/Incident Report; (3) statements by attending physician, Dr. Pinzon; (4) medical records from primary physician, Dr. Hauge, and neurosurgery and spine consultants; (5) disability questionnaires completed by Plaintiff; and (6) the Policy. [AR 22]. LICNA also relied upon the TSA in support:

> **Summary**
>
> Based on the information that is on file, you [Plaintiff] are currently able to perform work at the light level. Based upon the physical limitations as well as your work and educational history, occupations were identified which you are currently capable of performing. Your policy states that in order to be eligible for benefits, you must be unable to do any work for which you are or may become qualified by reason of your education, experience or training; and you must not [be] expected to do any such work for the rest of your life. As suitable occupations have been identified as a result of your Functional Capacity Evaluation, we have determined that no Permanent Total Disability benefits are due under policy OK 821732.

[AR 24].

On February 2, 2007, Plaintiff appealed LICNA's denial. [AR 20]. In his appeal letter, Plaintiff wrote the following:

> I am writing to appeal the decision of my Permanent Total Disability Insurance. I was hurt in an accident. I have been totally disabled more than 365 days afterwards. I have been totally disabled for almost 20 months now. I am currently receiving long term disability

because of my condition and am unable to work. I am on medicines for this condition. I still have more doctors to see. Dr. Hauge referred me back to my family physician for medicines and pain. My family physician thinks I need to go to Vanderbilt to be more evaluated to see if there is more that can be done. They are currently referring me to Vanderbilt at this time I am just waiting on my appointment. I currently am in a lot [sic] of pain and on pain meds. There is no way I could hold down any job at this time. I hope when I go to Vanderbilt there is something they can do to help me but for now I still am unable to work. I will contact you after I find out more about my appointment at Vanderbilt.

[Id.]. Plaintiff did not provide any new documents with his appeal letter. [Id.]. On February 13, 2007, LICNA denied Plaintiff's appeal. [AR 12-14]. In support, LICNA provided the following reasons:

Based on a review of your medical record and the Functional Capacity Evaluation examination performed on December 4, 2006. You [sic] demonstrated the ability to perform physical work at the light level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. Based on this evaluation, you are capable of sustaining the light level of work for an 8 hour day.

[AR 13]. During the internal appeal, LICNA had an unidentified physician review the medical record:

To ensure appropriate interpretation of the medical information on file, we had the file reviewed by one of our medical directors. He states that he saw no medical [documentation] to support restrictions from light work. Therefore, a review of the medical information in your claim file does not appear to support that you would be completely unable to work due to injures sustained during your June 9, 2005 incident.

[AR 13-14]. LICNA does not provide any additional information about the physician, or what medical documents he reviewed.

Having exhausted his administrative remedies, Plaintiff filed suit in federal court on February

13, 2009. [Plaintiff's Complaint, Doc. 1]. As a basis for this lawsuit, Plaintiff alleges that he was

denied benefits in violation of 29 U.S.C. § 1132(a)(1)(B). [Id.] Plaintiff challenges both the

procedures and substance of his denial. [Id.]. On August 25, 2010, Defendants filed a Motion for

Judgment on the Administrative Record [Doc. 12]. On November 11, 2010, Plaintiff filed a cross-

motion for Summary Judgment [Doc. 18]. This matter is now ripe for adjudication.

## II.    STANDARD OF REVIEW

As the Court of Appeals for the Sixth Circuit has stated, "[t]he summary judgment

procedures set forth in [Federal] Rule [of Civil Procedure] 56 are inapposite to ERISA actions and

thus should not be utilized in their disposition." Wilkins v. Baptist Healthcare Sys., 150 F.3d 609,

619 (6th Cir. 1998) (Gilman, J., concurring); *see also* Buchanan v. Aetna Life Ins. Co., 179 F. App'x

304, 306 (6th Cir. 2006) ("Traditional summary judgment concepts are inapposite to the adjudication

of an ERISA action for benefits . . . because the district court is limited to the evidence before the

plan administrator at the time of its decision . . ."). In resolving these cases, a district court should

instead employ the following steps:

> 1.    As to the merits of the action, the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.

> 2.    The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.

Wilkins, 150 F.3d at 619 (Gilman, J., concurring). "Under Wilkins, this Court has two possible

standards of review." Gibson v. Prudential Ins. Co. of Am., 513 F. Supp. 2d 960, 956 (E.D. Tenn. 2007). "If the trustees of an employee benefits plan do not have discretion to determine eligibility for benefits or to construe the terms of the plan in question, a court is required to undertake a *de novo* review of the administrators' decision." Id. However, "where a benefits plan vests discretion with the administrators, a court may only disturb the administrators' decision if it finds the basis of such a decision to be arbitrary and capricious." Id.

In the present case, the employee benefits plan does not provide LICNA with discretion to determine eligibility for benefits. Accordingly, the Court will undertake a *de novo* review of LICNA's decision to deny the Benefits. *See, e.g.*, Pollett v. Rinker Materials Corp., 477 F.3d 376, 377 (6th Cir. 2007) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). In applying this standard, the Court must determine whether the administrator made the "correct decision." Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 808-09 (6th Cir. 2002). In other words, when a Court reviews a decision *de novo*, "it simply decides whether or not it agrees" with the plan administrator's decision. Ragsdale v. Unum Life Ins. Co. of Am., 999 F. Supp. 1016, 1025 (N.D. Ohio 1998) (quoting Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6th Cir. 1990)).

While courts are generally "limited to a consideration of the information actually considered by the administrator," Killian v. Healthsource Provident Adm'rs, Inc., 152 F.3d 514, 522 (6th Cir. 1998) (citations omitted), there is an exception to this rule. Courts may consider evidence outside the administrative record if it is "offered in support of a *procedural challenge to the administrator's decision*, such as the alleged lack of due process afforded by the administrator or alleged bias on its part." Wilkins, 150 F.3d at 619 (Gilman, J., concurring) (emphasis added). *See also* Johnson v. Conn. Gen. Life Ins. Co., 324 F. App'x 459, 467 (6th Cir. 2009) ("The limitation on discovery

recognized in <u>Wilkins</u> is a result of the determination that matters outside the administrative record are ordinarily not relevant to the court's review of an ERISA benefit decision. District courts are well-equipped to evaluate and determine whether and to what extent limited discovery is appropriate in furtherance of a colorable procedural challenge under <u>Wilkins</u>."); <u>Moore v. LaFayette Life Ins. Co.</u>, 458 F.3d 416, 431 (6th Cir. 2006) ("[T]he only logical reading of this Court's instructions in <u>Wilkins</u> is that until a due process violation is at least colorably established, additional discovery beyond the administrative record into a plaintiff's denial of benefits is impermissible."). As will soon be explained, the Court finds that Plaintiff has made a colorable procedural challenge.[3] Accordingly, the Court's analysis is not limited to the Administrative Record.

Another factor to consider is that LICNA, the plan administrator, operated under a conflict of interest. Recently, the Supreme Court recognized that a plan administrator operates under a conflict of interest when, as here, it is both the decision-maker for claim coverage and also the payer of claims. In <u>Metro. Life Ins. Co. v. Glenn</u>, the Supreme Court held that a conflict of interest arises when "a plan administrator both evaluates claims for the benefits and pays benefits claims," 554 U.S. 105, 112 (2008), even when "the plan administrator is not the employer itself but rather a professional insurance company," <u>id.</u> at 114. In this case, LICNA operated under a conflict of interest because it both evaluated Plaintiff's claim, and would have been responsible for paying it. [AR 245, Insurance Agreement Between LICNA and BJC]. Because there is a conflict of interest, the Court will consider it as a "factor in determining whether there is an abuse of discretion." <u>Glenn</u>, 554 U.S. at 115 (citations omitted). As the Court of Appeals for the Sixth Circuit recently stated, "[t]he Supreme Court made clear in <u>Glenn</u> that such a conflict is a red flag that may trigger a

---

[3] *See infra* Part III.A.2

somewhat more searching review of a plan administrator's decision . . ." <u>Schwalm v. Guardian Life Ins. Co. of Am.</u>, 626 F.3d 299, 311-12 (6th Cir. 2010) (citing <u>Glenn</u>, 554 U.S. at 114).

While the conflict of interest is a factor to consider, it does not change the standard of review. As the Supreme Court stated in <u>Glenn</u>, "[w]e do not believe that <u>Firestone's</u> statement implies a change in the standard of review, say, from deferential to *de novo* review." 554 U.S. at 115. The Court does recognize, however, that <u>Glenn</u> involved a benefits plan that provided discretionary authority to the plan administrator in interpreting the plan. <u>Id.</u> Consequently, the Supreme Court reviewed the plan administrator's decision under the deferential "arbitrary and capricious" standard. <u>Id.</u> This is much different than the present case, in which the administrator's decision is being reviewed *de novo*. *See, e.g.*, <u>Pollett</u>, 477 F.3d at 377 (citation omitted). Despite the fact that these cases involve different standards of review, the Court will still follow <u>Firestone's</u> holding that conflicts of interest–as in the present case–should "be weighed as a 'factor' in determining whether there is an abuse of discretion." <u>Glenn</u>, 554 U.S. at 115 (quoting <u>Firestone</u>, 489 U.S. at 115). As the Supreme Court stated in <u>Glenn</u>, "[w]e believe that <u>Firestone</u> means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." <u>Glenn</u>, 489 U.S. at 117. This reasoning holds true, regardless of the standard of review that is applied. Accordingly, the Court will review LICNA's decision under a *de novo* standard of review, while also considering LICNA's conflict of interest as a factor.[4]

---

[4] In <u>Glenn,</u> the Supreme Court did not define how much weight this factor should be given. 554 U.S. at 115-19. Instead, the Court held that the factor should be weighed on a case-by-case basis: "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision,

# III.    ANALYSIS

## A.    Plaintiff's ERISA Claim Under 29 U.S.C. § 1132(a)(1)(B)

### 1.    Introduction

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In the present case, Plaintiff has challenged the substance of LICNA's denial, and the procedures that were used. The Court will address the procedural claim first.

### 2.    Plaintiff Did Not Receive a "Full and Fair Review"

To satisfy ERISA's procedural requirements, the plan administrator must:

> (1)    provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2)    afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. As the Court of Appeals for the Sixth Circuit has explained, "[t]he 'essential purpose' of the statute is twofold: (1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed by the fiduciary."

---

including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Id. at 118.

Wenner v. Sun Life Assurance Co. of Can., 482 F.3d 878, 882 (6th Cir. 2007) (citing Moore, 458 F.3d at 436). This circuit applies a "substantial compliance" test to determine whether Section 1133's notice requirements have been met. Wenner, 482 F.3d at 882 (citation omitted). The test "considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." Id. (citation omitted). "If the communications between the administrator and participant as a whole fulfill the twin purposes of § 1133, the administrator's decision will be upheld even where the 'particular communication does not meet those requirements.'" Id. (quoting Kent v. United of Omaha Life Ins. Co., 96 F.3d 803, 807 (7th Cir. 1996)).

Plaintiff claims that he did not receive a "full and fair review" for the following reasons:

    (1)    LICNA denied his appeal only seven days after it was filed;

    (2)    The denial was premature because Plaintiff's appeal letter stated that he was in the process of seeking additional medical advice; and

    (3)    the TSA relied upon by Defendants was severely flawed.

[Plaintiff's Motion for Summary Judgment, Doc. 18, at 1-2]. Having reviewed the Administrative Record, the Court finds that Plaintiff did not receive a "full and fair review." The following case is instructive.

In Elliott v. Met. Life Ins. Co., the plaintiff filed an ERISA claim after her claim for long-term disability benefits was denied by the plan administrator. 473 F.3d 613 (6th Cir. 2006). In support, the plaintiff argued that the administrator's decision–which was reviewed under the deferential "arbitrary and capricious" standard–lacked a "deliberate, principled reasoning process," and therefore was procedurally unreasonable. Id. at 618.

In 1989, the plaintiff suffered spinal-related injuries after a car accident. Id. at 615. In 1993, the plaintiff began working as a Business Quality Analyst for Great American Financial Resources. Id. As an employee, the plaintiff was covered under a benefits plan that was administered by Metropolitan Life Insurance Company ("MetLife"). Id.

Beginning in October 2002, the plaintiff began experiencing spinal pain. Id. While no doctor could explain with certainty why her symptoms reemerged, a neurologist in May 2003 found symptoms "consistent with a central cord-like syndrome." Id. The doctor noted that while the plaintiff was "better than she was six months ago," there was still "chronic pain and anxiety." Id. Consequently, the doctor recommended prescription medication and physical therapy. Id.

In September 2003, the plaintiff filed a claim for long-term disability benefits after a neurologist confirmed that she suffered from "chronic weakness and numbness that is exacerbated when she is standing for any length of time." Id. Under the employee benefits plan, MetLife had to determine whether the plaintiff's condition prevented her from performing her "own occupation." Id. at 617. The plan identified "own occupation" as "the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer." Id.

In December 2003, MetLife denied the claim. Id. at 615. The plaintiff then appealed, providing a letter from one of her doctors that listed specific limitations on her ability to work. Id. at 616. In response, MetLife had its own physicians review the claim. Id. While MetLife's physician conceded that the plaintiff's physician "appears to be credible," Metlife's physician nonetheless concluded that he was not "left with the impression given the current level of

documentation that the claimant appears medically unable to perform sedentary work based on the physical findings supplied." Id. Without providing any meaningful explanation, MetLife's physician concluded: "There was no indication that [the plaintiff's] condition caused impairments which that would have prevented [the plaintiff] from performing the duties of [her] job. Therefore, the original claim determination was appropriate." Id. The plaintiff then filed an ERISA action against MetlLife for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B). Id. at 616-17. The district court affirmed MetLife's decision. Id. at 617.

When the case reached the Court of Appeals, the court framed the issue as whether "MetLife made a deliberate, principled, and reasoned decision that [the plaintiff's] condition would not preclude her from performing her occupation." Id. at 618. The court began by recognizing that "[l]ogically, MetLife could have made a reasoned judgment only if it relied on medical evidence that assessed Elliott's physical ability to perform job-related tasks." Id. at 618 (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003) (citing Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 476 (7th Cir. 1998) (holding that the plan administrator "was under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job")). As the Elliott Court stated, *medical data, without reasoning cannot produce a logical judgment about a claimant's work ability*. Despite the numerous medical evaluations that took place in this case, MetLife did not rely on an application of the relevant evidence to the occupational standard when it denied her claim initially and on internal appeal." Elliott, 473 F.3d at 618 (emphasis added). There were several procedural defects in Elliott.

First, the court held that the initial denial letter did not provide a reasoned basis. Id. at 618-

19.  As the court explained, MetLife "merely recounted the technical contents of Elliott's various medical evaluations."  Id. at 619.  For example, MetLife wrote the following in its denial letter:

> Per the April 22, 2003 office note from Dr. Kuntz the findings of the January 14, 2003 EMG revealed normal nerve conduction of the bilateral upper and lower limbs.  Review of the CT of the cervical spine dated March 21, 2003, shows no evidence of significant central canal stenosis. . . .  It was suggested that you get a neurological consultation. . . . The medical [sic] documentation does not support a condition of a severity that would prevent you from working.

Id.  According to the court, MetLife did not provide a reasoned basis because:

> We note that, in the first denial letter, MetLife states that it considered Elliott's job description.  Nevertheless, there is no indication that MetLife reasoned from Elliott's condition to her ability to perform her occupation.  There is no statement or discussion of Elliott's occupational duties or her ability, or inability, to perform them.  Instead, the denial letter is a mere recitation of medical terminology employed by various physicians in their diagnoses of Elliott's condition, without any reasoning as to why those diagnoses would permit her to function in the workplace.  A court's decision that merely said 'affirmed' or 'reversed' could not be considered 'reasoned.'  Similarly, MetLife cannot be said to have given a reasoned denial of Elliott's claim, initially.

Id.

The second denial letter also lacked a reasoned basis.  Id. at 619-20.  In this letter, MetLife stated that it had a physician consultant conduct a file review of the plaintiff's claim.  Id. at 619.  Like the first denial letter, the court held that the second letter did not provide a reasoned basis:

> Dr. Menotti's [the consulting physician who reviewed the plaintiff's medical history on appeal] review bears a striking resemblance to MetLife's first denial letter.  In similar fashion, Dr. Menotti stated nearly verbatim from MetLife's letter the technical findings related to Elliott's condition.  That recitation occupies more than half of Dr. Menotti's two-page review.  In addition, Dr. Menotti presented no reasons for his conclusion that Elliott's condition would not preclude her from working.  *He never discussed Elliott's job duties, which implies that he did not conduct a reasoned evaluation of her*

*condition to determine whether she could perform those duties.*

To be sure, Dr. Menotti discussed Dr. Schneider's [the plaintiff's treating physician] conclusions about Elliott's limited work ability. In fact, he explicitly stated that Dr. Schneider's conclusions 'appear[ed] to be credible.' Yet Dr. Menotti offered no scientific rebuttal to Dr. Schneider's conclusions, nor did he opine as to how Elliott's medical condition related to the demands of her job. Instead, Dr. Menotti concluded that earlier records demonstrated that Elliott's condition 'improved over time' and that her 'chronic pain syndrome has responded to . . . medication.' However, logically speaking, evidence of an improvement, without a starting or ending point, does not help answer the question of whether an individual can perform her occupation. 'Getting better,' without more, does not equal 'able to work.'

Moreover, based on his determination that Elliott was improving, Dr. Menotti stated a conclusion that is arguably on a different plane than the proper inquiry. He wrote: 'I am not left with the impression given the current level of documentation that the claimant appears medically unable to perform sedentary work.' The term 'sedentary work' appears nowhere in the plan's terms. As we have noted, the proper inquiry is whether Elliott could perform her own occupation. Dr. Menotti never undertook such an inquiry.

Id. at 619-20 (emphasis added) (citations omitted). *See also* Justus v. Roofers' & Waterproffers' Local No. 44, No. 1:05-CV-2947, 2007 WL 892997, at *10 (S.D. Ohio Mar. 21, 2007) (explaining that MetLife's failure in Elliott was not discussing "specific occupational duties and to provide any reasoning with respect to how the claimant's condition would permit her to perform those duties- or otherwise function in a workplace").

Relying heavily upon the Court of Appeal's decision in Elliott, a federal district court recently held that a plan administrator did not offer a reasoned explanation for its denial of benefits. Justus, 2007 WL 892997, at *10. In particular, the court held that the plan administrator did not make an individualistic determination of the plaintiff's skills, or how they fit into particular job-related tasks:

In contrast, the Board's reliance on a single, equivocal sentence in a medical report stating that Justus [the plaintiff] 'may' be able to do a desk job–without any analysis whatsoever as to the types of skills possessed by Justus and how they fit into specific, job-related tasks–is indicative of the absence of a deliberate, principled, and reasoned decision.

...

Simply put, in the case before this Court, 'may be able to do'–without more–cannot be interpreted as equating to 'can do.' As Justus points out, the Board has essentially expanded Dr. Baishnab's tentative speculation regarding the possibility of a different occupation into an affirmative finding that substantial gainful employment on a permanent basis is within Justus' reach. Yet, there is absolutely no mention of what transferrable skills Justus has that might allow him to take a desk job, or any consideration how-or-if his residual capacity would affect his ability to hold such a position. . . .

Id., at *10-11.

Like the plan administrators in Elliott and Justus, LICNA failed to conduct the appropriate inquiry. The denial letters simply do not demonstrate that LICNA engaged in a "deliberate, principled reasoning process." Glenn, 461 F.3d at 666. An examination of the letters makes it abundantly clear.

On January 8, 2007, LICNA denied Plaintiff's claim for Benefits. [AR 24]. In particular, LICNA found that Plaintiff did not demonstrate that he was "unable to do any work for which [he] is or may become qualified by reason of [his] education, experience or training." [AR 24]. LICNA relied heavily upon the TSA to support its denial:

**Summary**

Based on the information that is on file, you are currently able to perform work at the light level. Based upon the physical limitations as well as your work and educational history, occupations were identified which you are currently capable of performing. Your policy states that in order to be eligible for benefits, you must be

> unable to do any work for which you are or may become qualified by reason of your education, experience or training; and you must not [be] expected to do any such work for the rest of your life. As suitable occupations have been identified as a result of your Functional Capacity Evaluation, we have determined that no Permanent Total Disability benefits are due under policy OK 821732.

[AR 24]. Plaintiff appealed shortly thereafter, and on February 13, 2007, LICNA denied Plaintiff's appeal. [AR 12-14]. LICNA provided the following reasons for its second denial:

> Based on a review of your medical record and the Functional Capacity Evaluation examination performed on December 4, 2006. You [sic] demonstrated the ability to perform physical work at the light level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. Based on this evaluation, you are capable of sustaining the light level of work for an 8 hour day.

[AR 13]. In reviewing Plaintiff's appeal, LICNA had an unidentified physician review the medical record:

> To ensure appropriate interpretation of the medical information on file, we had the file reviewed by one of our medical directors. He states that he saw no medical [documentation] to support restrictions from light work. Therefore, a review of the medical information in your claim file does not appear to support that you would be completely unable to work due to injures sustained during your June 9, 2005 incident.

[AR 13-14].

The denial letters are flawed for several reasons. In particular, the Court finds that the TSA conducted by Mr. Engel was inadequate. Like Elliott, the adequacy of the TSA is very important; the plan administrator relied heavily upon that document to support its denial. In Elliott, MetLife determined that because the plaintiff could perform "sedentary work," he was not entitled to disability benefits. 473 F.3d at 618. The Court of Appeals rejected this argument, holding that whether the plaintiff was capable of "sedentary work" was not the ultimate inquiry. Id. n.3. In

23

particular, the Court of Appeals held that MetLife's reasoning "was in error because it relies on a general notion of 'sedentary' work *rather than on the duties that Ms. Elliott's occupation entailed. The latter inquiry is the proper one under the plan's terms.*" Id. (emphasis added).

Like Elliott, the TSA in the present case suffers from the same flaws. In his TSA, Mr. Engel determined that Plaintiff was capable of performing six jobs. [AR 28]. These jobs included: (1) repair-order clerk; (2) check cashier; (3) service clerk; (4) order clerk; (5) registration clerk; and (6) surveillance system monitor. [Id.]. Mr. Engel claims that the TSA was based upon Plaintiff's education, work history, and the results from the PWPE. [AR 28.]. Based upon this information, Mr. Engel concluded that Plaintiff could function in an occupation having a "sedentary to light level of physical demand." [Id.]. In particular, Mr. Engel noted that Plaintiff "has adequate use of his upper extremities for reaching at desk level, fine manipulation and simple and firm grasping." [Id.]. That was the end of Mr. Engel's analysis.

While Mr. Engel states that he considered Plaintiff's work history, he did not discuss Plaintiff's past jobs in any meaningful way. [Id.]. As Plaintiff explains:

> [T]here is absolutely no consideration or discussion of past skills or job duties, nor is there a consideration or discussion of any specific vocational training that may be required for the alleged jobs that LINA asserts that Mr. Yates can perform. All of these jobs appear to involve office work and probably involve computer and other learned skills– none of which is considered by LINA. The report itself is so cursory it only uses ½ of a page. . . .

[Plaintiff's Response in Opposition to Defendants' Motion for Judgment on the Administrative Record, Doc. 14, at 12, n.1]. It is not clear what documents Mr. Engel relied upon; he simply states that he considered Plaintiff's "work history." [AR 28]. Notably, Mr. Engel did not describe the duties that Plaintiff performed in his previous jobs. [Id.]. Nor did Mr. Engel list the skills required

to perform the six jobs that he identified. [Id.]. Moreover, Mr. Engel did not explain why Plaintiff could perform those jobs, other than the fact that those jobs involved a "light-work" of activity under the DOT. [Id.].

Despite the foregoing, Defendants argue that the TSA was proper for the following reasons:

> Yates' claim for disability benefits also fails because he is capable of light-duty work. The TSA, performed on January 5, 2007, was based on Yates' reported education, work history, and the limitations and restrictions reported in the FCE. The Rehabilitation Specialist who performed the TSA concluded that Yates was qualified to perform six different 'light-duty' occupations. All of these fall [sic] occupations fall within the 'sedentary to light-level of physical demand' classification of jobs, which Yates is capable of performing based on his 'adequate use of his upper extremities for reaching at desk level, fine manipulation and simple and firm grasping.' This also is consistent with the FCE, which noted that Yates is 'capable of performing physical work at the light level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles.'

[Defendants' Memorandum of Law in Support of their Motion for Judgment on the Administrative Record, Doc. 13, at 11-12]. The fact that Plaintiff can perform "light-duty" work, however, is not the ultimate inquiry. Where is the discussion about Plaintiff's actual skills? Limiting the analysis to Plaintiff's physical condition is simply improper. *See, e.g.*, Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 215 (2d Cir. 2006) (holding that the plan administrator could not deny a benefits claim simply because the claimant was physically capable of performing an identified job).

As a "chemical operator laborer" during March 2004-July 2005, Plaintiff loaded boxes by hands, controlled fork trucks, and separated mixed radioactive waste. [AR 239]. As a "laborer" during January 2000-March 2004, Plaintiff tarped tractor trailers, tied down loads, moved furniture, helped carry boxes, cleaned radioactive materials, and mowed grass. [Id.]. As a "laborer" from June

1999-January 2000, Plaintiff poured concrete and carried materials. [Id.]. Mr. Engel does not mention any of these skills, or why Plaintiff would qualify for the six positions he identified.

Like Elliot, instead of listing the actual skills required for the six jobs, or how Plaintiff's work history and education prepared him for those jobs, Mr. Engel simply listed the DOT's SVP number for each of those jobs. [Id.]. *See* Smith v. Champion Int'l Corp., 573 F. Supp. 2d 599, 620 (D. Conn. 2008) (finding that the TSA was insufficient because the vocational expert "did not obtain sufficient information about the plaintiffs' work histories, instead relying on brief job descriptions"). Based upon Elliott, Mr. Engel needed to consider–and discuss–Plaintiff's skills, not just his physical limitations. *See* Creech v. UNUM Life Ins. Co. of N. Am., 162 F. App'x 445, 447-48 (6th Cir. 2006) (holding that relying upon a TSA that was based upon inaccurate information regarding the participant's position and duties, was arbitrary and capricious); Atkinson v. Prudential Ins. Co. of Am., No. 3:05CV00140, WL 1663832, at *10 (E.D. Ark. Jun. 14, 2006) ("Here Prudential [the plan administrator] based its final decision upon inconsistent pieces of information from two different vocational evaluations. Even assuming that Atkinson has the mental and physical capacity to perform sedentary work, as Prudential contends, it cannot base its decision that she is ineligible for benefits on its erroneous identification of sedentary jobs that she is not qualified to perform.") (citing Creech, 162 F. App'x at 447-48). As one court has stated, "[n]either an occupational title by itself nor a skeleton description is sufficient to determine activities involved in past work experience." Champion Int'l Corp., 573 F. Supp. at 620 (citation and quotation omitted).

LICNA's denial suffers from an additional procedural defect. Presumably, the unidentified physician reviewing Plaintiff's internal appeal was a consultant employed by LICNA. In its letter denying Plaintiff's internal appeal, LICNA stated:

> To ensure appropriate interpretation of the medical information on file, we had the file reviewed by one of our medical directors. He states that he saw no medical [documentation] to support restrictions from light work. Therefore, a review of the medical information in your claim file does not appear to support that you would be completely unable to work due to injures sustained during your June 9, 2005 incident.

[AR 13-14]. The consulting physician did not explain–in any meaningful way–why the medical information in the Administrative Record supported a denial of Plaintiff's claim. The Supreme Court has recognized that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003). In the present case, the consulting physician simply stated in a conclusory fashion that "medical information on file" did not support Plaintiff's claim. [AR 13-14]. The consulting physician did not mention any of the medical documents, or provide any justification. In addition, the consulting physician did not perform a physical exam of Plaintiff, but rather, simply relied upon the medical record. See Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005) (recognizing that the lack of a physical exam by the consulting physician is "just one more factor to consider in our overall assessment" of the plan administrator's decision to deny a claim for benefits, and "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"). This factor, coupled with LICNA's conflict of interest, provides further support that LICNA's review process was procedurally defective. See Glenn, 554 U.S. at 115 (emphasizing that a conflict of interest is a factor to consider in evaluating the plan administrator's decision).

Based upon the foregoing, the Court finds that LICNA's denial of benefits was procedurally unreasonable. In Elliott, the Court of Appeals for the Sixth Circuit held that "where the problem is

with the *integrity of [the plan's] decision-making process*, rather than that [a claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." 473 F.3d at 622 (emphasis added) (internal quotations and citation omitted). While the Court finds that LICNA's decision-making process was procedurally defective, it must now decide whether Plaintiff was "clearly entitled" to the Benefits.[5]

### 3. Plaintiff Is Not "Clearly Entitled" to the Benefits

As previously stated, because the Court found that LICNA's decision was procedurally unreasonable, the appropriate remedy is to remand the case to the plan administrator, unless the Court finds that Plaintiff was "clearly entitled" to the Benefits. Accordingly, the Court must now determine whether Plaintiff was "clearly entitled" to the Benefits.

To be eligible for the Benefits, Plaintiff must be considered "permanently totally disabled." To qualify, Plaintiff must satisfy the following criteria:

> **Coverage B: Permanent Total Disability (Not Applicable to Dependents):**
>
> We will pay this benefit if the Insured:
>
> 1. is injured by an accident covered by the policy; and
>
> 2. is totally disabled within 365 days after the accident; and
>
> 3. is totally disabled for 12 straight months; and
>
> 4. is then permanently totally disabled.

---

[5] The Court will not address Plaintiff's other procedural arguments [*See* Plaintiff's Motion for Summary Judgment, Doc. 18. at 1-2], having already found that LICNA did not provide a "full and fair review" of Plaintiff's claim.

> An Insured will be deemed 'totally disabled' if he can not do the substantial and material duties of his type of work at all. He will be deemed 'permanently totally disabled' if he can not do any work for which he is or can become qualified by reason of his education, experience or training; and if he is not expected to be able to do any such work for the rest of his life.

[AR 268]. Having reviewed the Administrative Record, the Court finds that there is conflicting evidence about whether Plaintiff qualifies as "permanently totally disabled." Accordingly, the Court does not find that Plaintiff is "clearly entitled" to the Benefits.

On June 9, 2005, Plaintiff injured his left leg and back while lifting a generator into a van. [AR 139]. The injury was diagnosed as a "L5-S1 herniated disc with compression of the S1 nerve root." [AR 3]. Following the injury, Plaintiff met with medical providers for treatment. [AR 13]. Over the course of two years, Plaintiff participated in extensive physical therapy to treat his back pain. This included physical therapy sessions with the Tennessee Orthopedic Clinic [AR 213-15], and Dr. Pinzon [AR 190, 184-86, 181-83, 187-89]. Plaintiff also underwent several surgeries to treat his back pain. [AR 13]. On June 12, 2006, Dr. Hauge performed a lumbar diskectomy. [AR 117-18]. However, based upon Plaintiff's continued back pain, Dr. Hauge performed a second lumbar spine diskectomy on October 13, 2006. [AR 77-78, 81-85].

There is also evidence that suggests Plaintiff's physical limitations are not as severe as he claims. In particular, Defendant argues that Plaintiff's disability claim is undercut by his "self-limiting performance during therapy and evaluations, which was manifested in both his physical activities and verbal responses." [Defendants' Memorandum of Law in Support of their Motion for Judgment on the Administrative Record, Doc. 13, at 10]. For example, during one of the physical therapy sessions at the Patrician Neal Outpatient Center in 2006, the physical therapist noted that Plaintiff demonstrated "self-limiting behavior." [AR 44]. In particular, the physical therapist

recognized that Plaintiff "walks [without] a limp on treadmill, but resumes limp when off of it."

[Id.]. Defendants argues that this behavior "suggested [Plaintiff] tried to hide, or self-limit, his actual ability" to perform physical activities. [Defendants' Memorandum of Law in Support of their Motion for Judgment on the Administrative Record, Doc. 13, at 4]. The Court agrees that the inconsistent manner in which Plaintiff performed the same activity (walking) raises questions about whether Plaintiff's "self-limiting" behavior was motivated by financial gain, rather than physical limitations.

In addition, during the PWEP that was performed in December 2006, Ms. Preston found that Plaintiff demonstrated "self-limiting" behavior on several tasks. [AR 58-66]. As previously explained, the PWPE consists of thirty-six tasks that are divided into seven sections. [AR 58]. The test assessed Plaintiff's dynamic strength, position tolerance, mobility, fine motor skills, balance, and endurance. [Id.]. Ms. Preston summarized Plaintiff's "overall level of work" as follows:

**Overall Level of Work:**

> Based on the information summarized in the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, the client is capable of performing physical work at the light level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. Based on this evaluation, the client is capable of sustaining the light level of work for an 8-hour day.

[Id.]. Ms. Preston's summary was based in part on Plaintiff's "self-limiting" behavior. As Ms. Preston explains, "self-limiting participation" means "that the client stopped the task before specific physical signs of a safe maximal effort were observed." [Id.]. Ms. Preston summarized Plaintiff's "self-limiting" behavior as follows:

**Overall Level of Client Participation:**

> Throughout this evaluation, participation was determined by comparing the client's willingness to exert a maximal effort to the evaluator's observations of client effort. Based on the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, the client participated fully in 11 out of 19 tasks and demonstrated self-limiting participation by stopping on 8 out of 19 tasks.

[Id.]. According to LICNA, "in nearly half of the tasks during the FCE, Yates' performance did not permit a fair and accurate interpretation of his actual physical abilities." [Defendants' Memorandum of Law in Support of their Motion for Judgement on the Administrative Record, Doc. 13, at 10]. In response, Plaintiff claims that he was concerned with "left buttocks pain, stinging sensation in lumbar spine, and/or radicular symptoms." [AR 58].

While it is true that the PWPE "cannot be used to assess the complex factors underlying self-limiting participation," the test does suggest a correlation. In particular, the PWPE states that if a client "self-limited on 5 to 67 tasks, *psychosocial and/or motivational factors may be influencing physical performance*." [Id.] [emphasis added]. Notably, Plaintiff self-limited on eight tasks. [Id.]. As the PWPE explains, "[i]f your client self-limited on 8 or more of the tasks, *it is even more likely* that psychosocial and/or motivational factors may be influencing physical performance." [Id.] [emphasis added]. Having completed the PWPE, Ms. Preston concluded that Plaintiff was capable of sustaining "light level" work for an 8-hour day, within the meaning of the DOT.

In sum, the Court finds that there is conflicting evidence in the Administrative Record regarding whether Plaintiff is "permanently totally disabled." In particular, the Court notes that Plaintiff underwent several surgeries over the course of two years, and participated in extensive physical therapy. However, there is also evidence that suggests Plaintiff's physical limitations were not as severe as he claimed. Because there is conflicting evidence in the Administrative Record

regarding whether Plaintiff is "permanently totally disabled," the Court finds that Plaintiff was not "clearly entitled" to the Benefits. Accordingly the appropriate remedy is to remand this case to the plan administrator for a "full and fair review" that is consistent with this Memorandum and Order. *See* Elliott, 473 at 622 (holding that "where the problem is with the *integrity of [the plan's] decision-making process*, rather than that [a claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator") (emphasis added).

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion for Judgment on the Administrative Record [Doc. 12] is **DENIED**, and Plaintiff's Motion for Summary Judgment [Doc. 18] is **GRANTED IN PART AND DENIED IN PART**. Accordingly, this case is **REMANDED** to the plan administrator for a "full and fair review" that is consistent with this Memorandum and Order. On remand, the plan administrator is **ORDERED** to conduct a vocational evaluation that is consistent with this ruling.


**IT IS SO ORDERED**.


**ENTER:**


_____s/ Thomas W. Phillips_____
United States District Judge